UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN S. JOHNSON,

              Plaintiff,                      Civil Action No. 2:12-cv-15593

        v.                           District Judge Avern Cohn
                                      Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10] AND
DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [13]**

Plaintiff Brian Johnson suffers from a mood disorder and depression. He believes that these impairments prevent him from engaging in full-time, competitive work. As such, he applied for disability insurance benefits and supplemental security income. An administrative law judge acting on behalf of Defendant Commissioner of Social Security ("Commissioner") denied his applications. Johnson filed this suit to challenge that decision. Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 10, 13). As detailed below, this Court finds that the ALJ failed to address numerous treatment records and that it is not apparent from the ALJ's narrative how she reconciled these records with those that supported her conclusion that Johnson was not disabled. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10) (which seeks only a remand for further proceedings) be GRANTED, that Defendant's Motion for Summary Judgment (Dkt. 13) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

### A. Procedural History

In August 2009, Johnson applied for disability insurance benefits and supplemental security income asserting that he became unable to work on June 9, 2008. (Tr. 21.) Johnson later amended his alleged disability onset date to July 29, 2009. (Tr. 39.) Johnson's applications were denied at the initial review level on January 15, 2010. (Tr. 21.) Johnson then requested a hearing before an administrative law judge, and on June 30, 2011, Johnson testified before Administrative Law Judge Jessica Inouye ("the ALJ"). (Tr. 37-79.) In a July 11, 2011 decision, the ALJ found that Johnson was not under a "disability" as that term is used in the Social Security Act. (*See* Tr. 21-31.) Her decision became the final decision of the Commissioner on November 7, 2012, when the Social Security Administration's Appeals Council denied Johnson's request for further administrative review. (Tr. 1.) This suit followed. (Dkt. 1, Compl.)

### B. Medical Evidence

The administrative record contains medical records corresponding to Johnson's physical and mental impairments. On appeal, Johnson relies only on the medical records relating to his mental impairments and has not challenged the ALJ's assessment of his physical impairments. (*See generally*, Pl.'s Mot. Summ. J.) Accordingly, the Court summarizes only Johnson's mental-health treatment.

In late July 2009, Johnson saw a physician assistant for back pain and depression. (Tr. 344.) Johnson reported having depression for "some y[ea]rs" and that he was experiencing stress, sleep disturbance, and decreased appetite. (*Id.*) Johnson was not having suicidal or homicidal ideation. (*Id.*) The physician assistant noted that Johnson was attempting to obtain counseling services. (*Id.*)

2

Starting in August 2009, and continuing through his June 2011 administrative hearing before the ALJ, Johnson treated at Training and Treatment Innovations, Inc. Over that approximately two-year period, he would see Dr. Jae Cho, a psychiatrist, for medication management; Michael Powers, Licensed Professional Counselor, for psychotherapy; and, for case management, Angela Hass, Limited License Master Social Worker, and Kevin Steinbauer, Licensed Baccalaureate Social Worker.

On August 4, 2009, Powers conducted an initial intake. Johnson told Powers that his parents divorced when he was two years old, his father did not acknowledge Johnson as his son, and his brother, who served as Johnson's only role model, died when Johnson was 16 years old. (Tr. 475.) Johnson further informed Powers that, in 1992, he spent one to two weeks in a psychiatric ward (for suicidal issues and fighting with the police), and that, in March 2009, he was hospitalized with psychiatric issues. (Tr. 475.)[1] Johnson reported having severe depression and mood swings; "I don't have any coping skills and I do not know how to deal with stuff." (Tr. 475.) Johnson also said, "I am just not a consistent person because of these mood swings[;] I just can't hold a job." (*Id.*) Johnson described alcohol abuse, having blacked out over 30 times with the most recent episode being in February 2009 (on Super Bowl Sunday). (Tr. 481.) Johnson, however, had attended 90 Alcoholics Anonymous meetings in the prior 90 days. (*Id.*) Johnson rated his depression at an eight or nine on a ten-point scale, but thought his mania was only a two on that scale. (Tr. 486.) Powers assessed Major Depression, Recurrent, with Psychotic Features, Alcohol Dependence, and assigned a Global Assessment of Functioning score of 25. (Tr. 483.) (A GAF score of 25 indicates "Some

---

[1]In early March 2009, Johnson was hospitalized for diabetic ketoacidosis. (Tr. 274.) Johnson has not identified treatment records in the administrative transcript corresponding to a March 2009 hospitalization for psychiatric problems.

danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM–IV*"), 30, 34 (4th ed., Text Revision 2000).) Powers also noted, "[Brian] has intense and intermittent suicidal ideation. The only suicidal protective factor is the fact that his mother has already lost one son and one daughter and Brian could not put her through more than she has already dealt with." (Tr. 483.)

About two weeks later, on August 19, 2009, Dr. Cho performed a psychiatric evaluation. (Tr. 458.) Johnson informed that he had often suffered from depression, mood changes, and suicidal thoughts during the past ten years. (Tr. 458.) Johnson provided that he would not have his life once his mother passed away. (*Id.*) Johnson rated his depression at an eight on a ten-point scale. (Tr. 459.) He also reported hearing voices (e.g., "over here") and having visual hallucinations involving a moving shadow. (Tr. 458.) Dr. Cho observed that Johnson's affect was blunted and thought content nihilistic. (Tr. 460.) Apparently updating Powers' diagnoses, Dr. Cho assessed Major Depression, Recurrent, with Psychotic Features and Mood Disorder, Not Otherwise Specified. (Tr. 458.) Dr. Cho prescribed Depakote, Seroquel, and Celexa. (Tr. 458, 461.)

In September 2009, Dr. Cho noted that Johnson's condition was improving. (Tr. 456.) Johnson told Dr. Cho that he was feeling a lot better and that the medications were helping. (Tr. 456.) Dr. Cho thought that Johnson's prognosis "appear[ed] to be pretty good." (Tr. 457.)

In October 2009, Hass, Johnson's case manger, completed a "Function Report – Adult – Third Party" in connection with Johnson's application for social security benefits. (Tr. 205-12.) Hass provided that she had seen Johnson for about an hour each week since August, which included going

4

to appointments, assisting Johnson with paperwork, and developing goals. (Tr. 205.) She provided that Johnson cared for his mother, cooked simple meals, did laundry and "minimal household repairs," watched sports on TV, and played video games. (Tr. 206, 207, 209.) In terms of social interactions, Hass indicated that Johnson had trouble communicating and had problems with co-workers. (Tr. 210.) She provided that Johnson had been fired or laid off because of "conflict with co-workers telling him what to do rather than supervisors" and that Johnson handled stress poorly, which led to depression and suicidal ideation. (Tr. 211.)

In November 2009, Dr. Robert Newhouse, reviewed Johnson medical file. (*See* Tr. 421.) Based on Dr. Newhouse's notes, it appears that Johnson's file then consisted of Powers' August 4, 2009 intake, Dr. Cho's August 19, 2009 psychiatric evaluation, Dr. Cho's medication review note from September 2009, and Hass' function report. (Tr. 421.) Dr. Newhouse opined, "The claimant has not been fully compli[a]nt with treatment. Currently appears to be more compli[a]nt and is doing fairly well. ADL do appear independent to level of motivation. May have trouble with complex detailed tasks and function best in small familiar groups. Retains ability to do simple tasks on sustained basis." (Tr. 425.)

Johnson also saw Dr. Cho in November 2009. (Tr. 454-55.) Johnson reported that his sleep had improved to five to six hours per night. (Tr. 454.) Dr. Cho noted, "depression also somewhat improved but [he] still [has a] down mood." (*Id.*) Dr. Cho further noted, "He said he has low self esteem for long years, [*sic*] one . . . factor is his ha[i]r almost bald which has been going on since early 20s. We have discussed this issue." (*Id.*) Dr. Cho increased Johnson's dosages of Seroquel and Celexa. (Tr. 455.)

In December 2009, Andrew Sears, M.D., evaluated Johnson's physical and mental

impairments for the Michigan Disability Determination Service, a state agency that helps the Social Security Administration evaluate claimants in Michigan. (Tr. 427-29.) Johnson reported feeling depressed and withdrawn, that he could not keep friends or a job, and that had been having "suicidal thoughts and thoughts of hurting others." (Tr. 427.) Upon examination, Dr. Sears noted, "he does not appear to have any cognitive deficit, but he is significantly depressed." (Tr. 428.) Dr. Sears concluded, "He has significant psychiatric problems. He will need intensive psychotherapy and counseling. At the current time his mental problem appears to be the most significant disability. In addition he has back pain and this will affect his ability to function at gainful employment." (Tr. 429.)

On January 27, 2010, Johnson started therapy with Powers. (Tr. 547.) But when Johnson expressed thoughts of killing himself, Powers conducted a suicide assessment. (*Id.*) Although not specifying a date, the assessment provides, "took 12/15 sleeping pills [and] woke up." (Tr. 596.) It also provides, "Kills self [with] gun today. Does have access to a gun." (*Id.*) Powers concluded that Johnson's risk of suicide was "high" and transported Johnson to crisis services, which recommended inpatient care. (Tr. 545.) Johnson admitted that he needed help but "asked for one more night to have [a] conversation with his mother." (*Id.*) With Johnson's assurance that he could stay safe for the night, Powers agreed to bring Johnson to crisis services or inpatient care the following morning. (*Id.*) Apparently, Johnson still felt suicidal the next morning and reported having access to a firearm, but was ultimately not admitted. (Tr. 437; *see also* Tr. 596-601.)[2]

---

[2]The suicide assessment in the record has the date "7-28-2010" written on it. (Tr. 596.) And it does appear that Johnson was scheduled to see Powers on July 28, 2010. (Tr. 602.) The Court nonetheless believes that the "7" was a very poorly written "1" given that (1) there is only one suicide assessment in the record completed by Powers, (2) Johnson first saw Powers for therapy on January 27, 2010 (Tr. 547) and the assessment provides "new therapist today" (Tr. 601), (3) Johnson

From February to mid-October 2010, it appears that Johnson's depression lessened but continued to be significant. In February, Johnson reported to Powers that he was having significant depression. (Tr. 543.) The next month, Dr. Cho noted that Johnson was "still having some mood swing[s] and [feels] down at time[s]." (Tr. 452.) Johnson also said that he sometimes felt uncomfortable meeting other people or friends. (Tr. 452.) Johnson also saw Powers in March 2010 and reported that his depression was a seven on a ten-point scale. (Tr. 541.) In April 2010, Powers noted, "Brian presented with better affect than[] has been seen in prior weeks. The intensity of his depression has lessened." (Tr. 537.) Later that month, Powers explained that typically counseling services lasted for only 90 days (so that others who needed treatment could access services), but, because of "the intensity of Brian's chronic depression and the fact that he [was] responding to services," Johnson's services would continue. (Tr. 533.) In May 2010, Johnson told Dr. Cho that he had stopped Seroquel because he was diabetic and gaining weight. (Tr. 450.) Johnson also wanted to stop taking Depakote because it too was causing weight gain. (*Id.*) Johnson reported still hearing voices at times. (*Id.*) Dr. Cho altered Johnson's medications to Abilify, Trileptal, Celexa, and Desyrel (Trazodone) for sleep. (Tr. 451.) Later in May, Johnson told Dr. Cho that he was unhappy with himself because of the difficulties he had maintaining relationships, including with a recent girlfriend. (Tr. 448.) Johnson also reported that his sister had both of her legs amputated and that he had to take care of her. (*Id.*) Dr. Cho noted, "He [is] still having some impulsive decision making and having some problem[s] with social skill[s], unable to maintain[] [a] job and personal

---

saw Dr. Cho on July 28, 2010 and their focus was on medication side effects (which did not include suicidal thoughts) and Johnson provided that he was not having psychotic symptoms (Tr. 445), and (4) Powers' group-therapy note from August 3, 2010 and individual therapy note from August 4, 2010 do not mention any recent suicide assessment (Tr. 592, 594).

relation[ship]. He is cooperative and friendly otherwise." (Tr. 449.) Dr. Cho increased Johnson's dose of Trileptal and Desyrel while maintaining Johnson's prescriptions for Abilify and Celexa. (Tr. 449.) In June 2010, Johnson told Dr. Cho that he was having some suicidal thoughts since the medication change. (Tr. 446.) Johnson also reported poor sleep and some anxiety. (*Id.*) Dr. Cho again increased Trileptal, added Klonopin, and maintained Johnson's other medications. (Tr. 447.) In late July 2010, Johnson reported to Dr. Cho that he was having several side effects from his medications. (Tr. 444-45.) Dr. Cho noted, "He is cooperative and denies having psychotic symptoms at this time. He said he is doing pretty good otherwise." (Tr. 445.) Dr. Cho altered Johnson's medications. (*Id.*) In August 2010, case manager Hass noted, "[Mr. Johnson] continues to suffer from depression and has times when he expresses suicidal thoughts. He has built a healthy therapeutic relationship with both his case manger and therapist, and benefits from meeting with both of them." (Tr. 464.) In September 2010, Powers noted that Johnson "presented with significant anxiety and depression." (Tr. 616.) Powers reminded Johnson of the difficult circumstances he was facing, "which would be overwhelming for any person." (Tr. 616.) In addition to his sister's amputations, Johnson's mother had recently had surgery to treat possibly fatal cancer. (*Id.*) In early October 2010, Johnson informed Dr. Cho of his family difficulties and that he was not sleeping well. (Tr. 442.) Johnson felt "down." (Tr. 443.) Dr. Cho increased Johnson's medications. (*Id.*)

Johnson's condition improved in the second half of October 2010. On October 14, Powers noted that Johnson had a "good affect." (Tr. 610.) Although Johnson may have been speaking of only his diabetes medications, Powers also noted, "Brian stated that he feels like he is finally on the right doses and combinations of medication. [Brian] commented, 'I have . . . p[ea]ce of mind about the medications and doses I am on at this time.'" (*Id.*) At the end of October 2010, Powers noted that

8

Johnson had an "appropriate affect." (Tr. 608.) Powers wrote, "This worker discussed with Brian, the process of terminating his counseling services. This worker states that Brian's affect has improved dramatically and he would receive on-going support from the FPE services, which he will continue to participate in. Brian and this worker agreed that he would be seen for one more session and then, his services would end." (Tr. 608.) "FPE services" refers to group therapy led by Powers that Johnson had been attending since May 2010. (*See* Tr. 533.)

Johnson saw Dr. Cho in November and December 2010 for sleep issues. (Tr. 438-41.) Johnson reported that he was sleeping five to six hours a night but that it was taking him two to three hours to fall asleep and it was hard to go back to sleep. (Tr. 440.) Johnson wanted to restart Seroquel. (*Id.*) Dr. Cho cautioned that Seroquel was "clearly . . . not going to help" with Johnson's diabetes and weight issues. (*Id.*) So Johnson decided to try Benadryl first. (*Id.*) But in December, Dr. Cho wrote, "He has . . . tried Benadryl but [it] didn't work so he really wants to go back to Seroqu[e]l inspite of all explanation of possible side effect[s] including weight gain[,] blood sugar []issue[s,] and cholesterol." (Tr. 438.)

It appears that Johnson's depression and mood disorder continued to be relatively well managed in January 2011. When Johnson saw Powers for group therapy, Powers encouraged Johnson to meet with him for "one on one time" so that the two could work through stress relating to the health of Johnson's family members. (Tr. 682.) Johnson also met with Hass in January. (Tr. 680-81.) Hass wrote, "Brian made no complaints about physical health or mental health. Brian discussed his classes at Delta College, and how he is having trouble with computers as he has little experience using one." (Tr. 680.) Johnson presented Hass with a Michigan Department of Health and Human Services form requesting verification of mental-health services; Hass wrote, "[I] typed

9

a letter explaining the services received and verifying his participation. Letter also stated that Brian is going to continue to be eligible for Medicaid and SDA [State Disability Assistance]." (*Id.*) Hass informed Johnson that Steinbauer would be taking over as Johnson's case manager. (*Id.*) At the end of January, Johnson saw Dr. Cho. (Tr. 679.) The psychiatrist noted, "He is attending Delta college computer class but [it is] very hard to comprehend. He is cooperative and friendly. He appears quiet . . . but stable mood. He said he wants to continue Delta college as of today. He was encouraged to do so. He seems [to be] responding favorably to Trileptal and Seroquel." (Tr. 679.)

From February through May 2011, however, Johnson reported difficulties with mood stability to Powers, Steinbauer, and Dr. Cho. In February, Powers noted that Johnson "presented with moderate depression" at a group-therapy session. (Tr. 675.) Powers also wrote, "Brian stated he is having trouble with the adjustment back into the college classroom, after being away from 20+ years. He commented that he is computer illiterate and ha[s] many difficulties in that class, which is causing him a great deal of stress and turmoil." (*Id.*) When Johnson saw Steinbauer a few days later, he similarly remarked, "I'm doing so-so, school has been really hard and is str[e]ssing me out." (Tr. 673.) Johnson also reported that his medications were helpful, but his moods still went "up and down." (Tr. 673.) Steinbauer noted that Michigan's Department of Human Services had determined that he was no longer disabled, and thus, Medicaid, food stamps, and financial support would cease. (*Id.*) In March 2011, Steinbauer accompanied Johnson to his medication review appointment with Dr. Cho. (Tr. 663.) Dr. Cho wrote, "[Mr. Johnson] said he still [has] some fluctuation of mood. Seroqu[e]l so far working well." (*Id.*) For Johnson's mood swings Dr. Cho increased Trileptal; Dr. Cho noted that if Johnson remained depressed, he would increase Seroquel or add an anti-depressant. (Tr. 664.) Dr. Cho also remarked, "[Steinbauer] is advised to keep an eye on him.

10

[Johnson] denies having any feeling to ha[]rm himself." (*Id.*) About two weeks later, Johnson told Steinbauer, "I may wake up feeling ok, but then an hour later I feel depressed and can[']t get myself to do anything[.] I don't talk to people much anymore." (Tr. 657.) In April 2011, Powers noted, "[Johnson] presented [at group therapy] with flat affect and reported that he has been struggling with mood swings. His [activities of daily living] were excellent this afternoon. . . . He also commented that his medications are not controlling his symptoms at this time and he feels a[ ]void deep inside his soul." (Tr. 651.) Later that month, Steinbauer noted that Johnson presented as "depressed, withdrawn, oriented x3, affect flat." (Tr. 647.) Steinbauer wrote, "Brian reported depression has decreased since his father passed away last week. Brian reported [that his] mood fluctuates daily and his sleep patterns are inconsistent." (Tr. 647.) In late May 2011, Johnson told Steinbauer, "I'm doing so-so, [m]y mood has been up and down a[ ]lot." (Tr. 642.) Johnson also provided that he had been depressed and was having difficulty with concentration and memory and sleep. (*Id.*) Johnson denied suicidal ideation. (*Id.*) Steinbauer thought that Johnson had a "flat" affect and a "depressed" mood. (Tr. 642.)

Johnson saw Dr. Cho on June 16, 2011. (Tr. 638-39.) Dr. Cho wrote, "[Mr. Johnson] said he has been doing pretty good except high anxiety particularly related with [the] hearing coming [up] for social security etc. He was explained that anxiety is a psychological defense so no[t] to worry about [it]." (Tr. 638.) Dr. Cho also wrote, "[Mr. Johnson] seems [to be] responding favorably to current medications. He is cooperative and friendly. Mood appears stable." (Tr. 639.) Dr. Cho did not alter Johnson's medications. (*Compare* Tr. 639, *with* Tr. 664.)

Four days later, on June 20, 2011, Dr. Cho completed a "Listing of Impairments – Section 12" form supplied by Johnson's counsel. (Tr. 528-29.) The form sets forth the A, B, and C criteria

11

associated with the Social Security Administration's Listing 12.04 for affective disorders. (Tr. 528-29); *see also* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04. As the form indicates, a claimant can satisfy Listing 12.04 if he satisfies both the A and B criteria of the Listing, or the Listing's C criteria. (Tr. 528-29); *see also* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04. (Although the form does not say so, the satisfaction of any of the Administration's listings means that the claimant is presumptively disabled for purposes of social security benefits. *See* (Tr. 24-26); 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04.) Dr. Cho indicated that Johnson satisfied the A criteria because he had "[m]edically documented persistence, either continuous or intermittent," of a "[d]epressive syndrome" characterized by, among others symptoms, "[a]nhedonia[3] or pervasive loss of interest in almost all activities," "[d]ecreased energy," "[d]ifficulty concentrating or thinking," "[t]houghts of suicide," and "[h]allucinations, delusions or paranoid thinking." (Tr. 528.) Dr. Cho indicated that Johnson had "marked" limitations in activities of daily living, difficulties in maintaining social functioning, and maintaining concentration, persistence, or pace—ratings which satisfy the B criteria. (Tr. 529.) Regarding the listing's C criteria, Dr. Cho provided that it was satisfied because Johnson had a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (Tr. 529.)

Also on June 20, 2011, Dr. Cho wrote a letter to the attorney handling Johnson's social security disability application:

> Mr. Johnson has been diagnosed with Major Depression with

---

[3]"A psychological condition characterized by the inability to experience pleasure in normally pleasurable acts." Webster's Third New International Dictionary, Unabridged, "anhedonia," http://unabridged.merriam-webster.com (last visited Feb. 14, 2014).

> psychotic features 296.34 and Mood disorder 296.90. Mr. Johnson's illness involves symptoms including dramatic mood swings sometimes on a daily basis. He has exhibited depression with suicidal ideations. He reports difficulty sleeping and decreased appetite. Mr. Johnson's mood instability makes it very difficult for him to maintain employment and social connections as his affect is often blunted, withdrawn and he experiences paranoia and anxiety. Mr. Johnson displays difficulty with concentration and comprehension, as well as Anhedonia in relation to routine daily activities and interests. These symptoms make it very difficult for him to maintain a consistent daily routine necessary for maintaining employment or education.

(Tr. 531.) The letter continues by describing Johnson's course of treatment and prognosis:

> Mr. Johnson has been cooperative and engaged in treatment over the last two years. Mr. Johnson has regularly discussed issues related to his depression, stressors related to employment and school, health and relationship issues. Mr. Johnson has participated in individual therapy as well as group therapy . . . over the last twelve months. Mr. Johnson has continued to experience difficulty related to his depression even with medications and case management support and has been unable to maintain employment and achieve his educational goals.

> I believe Mr. Johnson will continue to require ongoing mental health treatment indefinitely to remain stable and in the community, with his prognosis being fair with medications and CSM services.

(Tr. 531.) Dr. Cho's letter is cosigned by Steinbauer. (*Id.*)

### C. Testimony at the Hearing Before the ALJ

At his June 2011 administrative hearing, there was considerable discussion about Johnson's past work. Before Johnson went on the record, his counsel explained to the ALJ,

> my client and I discussed before the hearing that I had pointed out that he had 27 different jobs in the last 15 years. He wanted . . . me to make sure that you knew he actually had more like 40 to 50 jobs over his work career; that I had just limited it to the 15-year past relevant work period, and he wanted me to be sure to point that out, because from his point of view, he keeps trying to work, and either he gets fired or he cannot sustain a job, and that's basically what the—what his history of employment has been.

13

(Tr. 41-42.) The ALJ inquired into about 15 of these jobs, including Johnson's work as a janitor, constructing car ramps, on a production line for a part-painting company, as a 7-Eleven clerk, as a clerk at a Salvation Army store, and as a suit salesman. (*See* Tr. 43-51.) For many of the jobs, Johnson could not remember his specific duties, how long he held the job for, or why his employment ended. (*See* Tr. 43-51.) Johnson did recall that he had "issues" with his boss and was fired from the ramp-making position (Tr. 46), that he stopped working the part-painting job because of "some type of conflict once again" (Tr. 47), that he stopped working at Salvation Army because of "some conflicts" and "[a] lot of depression, mood swings" (Tr. 49), and that he stopped working his longest tenured job (four to five years as a school custodian) because of "conflicts, . . . poor job performance[,] . . . [they] sold me out" (Tr. 51).

Johnson also testified about the symptoms he experienced from his mental impairments. When the ALJ asked Johnson about the most significant issue preventing him from working, Johnson answered, "I think, my stress and my anxiety. I have no conversation—I don't have social skills. My social skills are at animal level. I'm not comfortable around people. I don't have people skills. I'm not a people person, and I'm not comfortable around people." (Tr. 55.) Johnson also testified to some delusions: "I keep hearing voices. Most common voice is telling me to turn around over here. You know, and I'm looking around, and sometimes, I'm seeing things that's not there. I don't know if it's a (INAUDIBLE), or I don't know what it is, but I see things running across the room, and stuff like that." (Tr. 65.) Johnson provided that he still had suicidal thoughts, and, on occasion, homicidal thoughts. (*Id.*) Johnson said that he could read a short article in the newspaper but could not "comprehend" it. (Tr. 52.) Johnson further explained he lacked the concentration to read a book all the way through (Tr. 52); "I maybe get through a page, and I just lose interest" (Tr.

14

67). But Johnson could sit through a sitcom. (Tr. 67.) Johnson also testified to short-term memory problems and provided an example of forgetting to do something for his nephew before the hearing. (Tr. 68.) Johnson provided that he was taking psychiatric medications and attending therapy but was "not getting better." (Tr. 58.) When the ALJ asked if alcohol played any role in Johnson's condition, Johnson answered, "I haven't had a drink in about six years. That has nothing to do with it." (Tr. 61.)

In terms of daily activities, Johnson provided that he took care of his mother and sister, and performed a number of household chores, including the dishes, cleaning, and laundry. (Tr. 60.) But Johnson also testified that he was limited socially: he provided that he had "[n]o friends" and that he did not "really . . . go [any]where except to [his] mother's." (Tr. 60.) Johnson stated that, despite lying down for a long time, he would not fall asleep until 5:30 a.m. (Tr. 68-69.) In Johnson's words, "It's unbelievable. I just—I mean, like I said, I'll sleep two or three hours, maximum. And that's one thing that, you know, I've talked to my therapist about a lot. It's just frustrating. I did go to do a sleep apnea, and they said that I had apnea, but they told me, if you try sleeping on your side, you should be able to fall asleep. But it's hard getting comfortable. You know, I have a lot of things on my mind. I don't know. My mind is just wired up all the time." (Tr. 69.)

Given the opportunity by his counsel to tell the ALJ "anything else," Johnson testified, "Well, Judge, it's obvious that you know that I've had a lot of jobs. I want you to know that I have tried. I've given effort. But I just have not been successful. I'm just not a consistent person. I don't know no other way to tell you. I'm just not a consistent person." (Tr. 69.) In response to a follow-up question by his counsel, Johnson added, "I feel like I'm a failure. I look back over all the jobs I've had, and I just shake my head, and I know the average person probably would, too. I mean, it's

15

ridiculous, you know. But it's obvious it's the reason for this happening in my life, you know, and I'm just, I'm—if I get another job, and I lose it, I don't know what's going to happen to me. Something not good is going to happen, I know. I feel it in my heart, you know." (Tr. 68-69; *see also* Tr. 54 ("I have fears about a job, because the last job is what really—I was contemplating suicide, ma'am, because I cannot keep a job.").)

At the hearing, the ALJ also solicited testimony from a vocational expert to find out whether jobs would be available to a hypothetical individual with functional limitations approximating Johnson's. In particular, the ALJ asked the expert to consider a person of Johnson's age, education, and past work experience capable of medium exertion, non-production oriented, simple, unskilled work, with a Dictionary of Occupational Titles Specific Vocational Preparation level of 1 or 2, but who "should not work in close proximity to coworkers, should have no contact with the public, [and should have] only occasional supervision," should not be required to drive at night, or have "more than very basic reading skills." (Tr. 75.) The expert testified that his "definition of production-rated work" was "any use of upper extremities more than frequently" and provided that the hypothetical individual could work as an industrial cleaner, production machine tender, or filter changer. (Tr. 75-76.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

16

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

The ALJ applied this five-step framework as follows. At step one, she found that Johnson had not engaged in substantial gainful activity since the unamended alleged disability onset date of June 9, 2008. (Tr. 23.) At step two, she found that Johnson had the following severe impairments: diabetes mellitus and depression. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 24-26.) Between steps

17

three and four, the ALJ determined that Johnson had the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) "except the claimant must not be required to drive at night or use anything more than basic reading skills[;] [t]he claimant can perform simple, unskilled, nonproduction oriented work with an SVP of 1 or 2; [t]he claimant must not work in close proximity to coworkers and have no contact with the public; [t]he claimant must have only occasional supervision." (Tr. 26.) At step four, the ALJ found that Johnson was unable to perform any past relevant work. (Tr. 29.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Johnson's age, education, work experience, and residual functional capacity. (Tr. 29-30.) The ALJ therefore concluded that Johnson was not disabled from the alleged onset date through the date of her decision. (Tr. 30.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also

supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Johnson says that the ALJ erred in three related ways. First, says Johnson, the ALJ failed to perform a proper evaluation of Dr. Cho's June 2011 opinions. (Pl.'s Mot. Summ. J. at 12.) Johnson next says that the ALJ failed to adequately articulate how she assessed his residual functional capacity. (*Id.* at 12-14.) Finally, Johnson argues that the ALJ "mischaracterized the evidence and [his] testimony, resulting in a faulty credibility analysis." (*Id.* at 16; *see also id.* at 15, 17.) Underlying all of these arguments is Johnson's claim that the ALJ failed to discuss a myriad of treatment records. (Pl.'s Mot. Summ. J. at 8-11, 13, 17.) The Court agrees.

19

A social security ruling, binding on the Administration, 20 C.F.R. § 402.35(b)(1); *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984), sets forth what an ALJ must explain in her narrative when assessing a claimant's residual functional capacity:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.*

> Symptoms. In all cases in which symptoms, such as pain, are alleged, the RFC assessment must:

> * Contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;

> * *Include a resolution of any inconsistencies in the evidence as a whole*; and

> * *Set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.*

S.S.R. 96-8p, 1996 WL 374184, at *7 (emphases added).

Here, the ALJ's primary rationale for her mental residual functional capacity assessment was that the "record reveal[ed] that [the claimant's] treatment ha[d] been generally successful in controlling [his allegedly disabling] symptoms." (Tr. 27.) The ALJ then supported this finding by citing the following evidence:

> On August 8, 2009, Mr. Thery noted that the claimant was feeling a

little better after starting psychotropic medication (4F/4).

On September 15, 2009, Dr. Cho noted that the claimant was responding favorably to his current medication and his prognosis appeared to be "pretty good" (5F/30) [(Tr. 396)]. [At that appointment,] [t]he claimant reported that he was feeling a lot better and his medications were helping (9F/22) [(Tr. 456)].

The claimant has not alleged any side effects from the use of medications (5F/36, 38; 23F/28) [(Tr. 402, Sept. 17, 2009 Progress Note by Hass; Tr. 404, Sept. 14, 2009, Progress Note by Hass; Tr. 665, Mar. 9, 2011 Progress Note by Steinbauer)].

On October 21, 2010, the claimant's therapist, Michael Powers, L.P.C., terminated the claimant's counseling sessions because the claimant's affect had improved dramatically (21F/2) [(Tr. 608)].

On January 31, 2011, Dr. Cho noted that the claimant's mood was stable (23F/42) [(Tr. 679)].

On June 16, 2011, Dr. Cho noted that the claimant was responding favorably to current medication, was cooperative and friendly, and his mood appeared stable (23F/2) [(Tr. 639)].

(Tr. 27 (paragraphing altered).)

The problem with this explanation is not so much what it says, but what it does not say. The ALJ failed to mention at least the following pieces of information about Johnson's condition:

• November 2009: Dr. Cho notes, "depression . . . somewhat improved but [Mr. Johnson] still [has a] down mood" (Tr. 454);

• January 2010: Johnson attempts suicide with sleeping pills or at least is a high risk for suicide and expresses killing himself with a gun, and a crisis center believes that inpatient treatment is appropriate (Tr. 437, 547, 596-601);

• February 2010: Johnson reports to Powers that he is having significant depression (Tr. 543);

• March 2010: Johnson reports to Powers that his depression is a seven on a ten-point scale (Tr. 541);

• April 2010: Powers notes that Johnson's affect has improved and depression has "lessened" (Tr. 537), but also wants Johnson to continue one-on-one counseling despite expiration of

that services in part because of "the intensity of [Johnson's] chronic depression" (Tr. 533);

- May 2010: Johnson tells Dr. Cho that he still occasionally hears voices (Tr. 540) and Dr. Cho notes, "He [is] still having some impulsive decision making and having some problem[s] with social skill[s], unable to maintain[] [a] job and personal relation[ship]" (Tr. 449);

- June 2010: following a medication change, Johnson reports suicidal thoughts to Dr. Cho (Tr. 446);

- July 2010: Johnson denies psychotic symptoms and is doing pretty well (Tr. 445);

- August 2010: Hass notes, "[Mr. Johnson] continues to suffer from depression and has times when he expresses suicidal thoughts" (Tr. 464);

- September 2010: although Johnson is facing stressors that would be overwhelming for anyone, Powers notes that Johnson "presented with significant anxiety and depression" (Tr. 616);

- November and December 2010: Johnson sees Dr. Cho for sleep problems and wants to take medication that would likely have an adverse effect on his physical health (Tr. 438-41);

- January 2011: although Powers and Johnson had terminated one-on-one counseling, Powers offers to meet with Johnson for "one on one time" so that the two could work through stress relating to the health of Johnson's family members (Tr. 682);

- February 2011: Powers notes that Johnson "presented with moderate depression" at a group-therapy session (Tr. 675);

- March 2011: Johnson tells Dr. Cho he is still having some mood swings and Dr. Cho alters Johnson's medications (Tr. 663-64);

- April 2011: Powers notes that Johnson had a flat affect, Steinbauer notes that Johnson is depressed and withdrawn, and Johnson reports that he is still having mood swings and that his medications are not controlling his symptoms (Tr. 647, 651);

- May 2011: Johnson tells Powers that his mood is "up and down a[ ]lot" and that he is having difficulties with concentration, memory, and sleep; Steinbauer notes that Johnson had a flat affect and depressed mood (Tr. 642).

In other words, a lot of records are omitted from the ALJ's narrative. To be sure, as the

Commissioner points out, an ALJ is not required to discuss every piece of evidence in the record.

22

*See Kornecky*, 167 F. App'x at 508 ("[A]n ALJ can consider all the evidence without directly addressing in [her] written decision every piece of evidence submitted by a party."). Further, the ALJ's reliance on Powers' "improved dramatically" statement, along with her discussion of Dr. Cho's January and June 2011 treatment notes indicating stable moods, permits the Court, and presumably Johnson, to understand why the ALJ thought that Johnson's post October 2010 records supported her claim about Johnson's response to treatment. But the ALJ, by citing August and September 2009 treatment records indicating improvement, apparently also thought that Johnson's treatment prior to October 2010 was consistent with her conclusion. And the foregoing list of evidence—all omitted from the ALJ's discussion—indicates that Johnson had considerable symptoms, including a suicide attempt or near suicide attempt, during this earlier period. Without any explanation from the ALJ regarding these records, the Court must speculate as to how they square with her finding that treatment generally controlled Johnson's symptoms. As such, the ALJ did not adequately explain how "material inconsistencies or ambiguities in the evidence in the case record were considered and resolved" and did not provide "a thorough discussion and analysis of the objective medical and other evidence." *See* S.S.R. 96-8p, 1996 WL 374184, at *7; *Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) ("[A]n 'ALJ may not select and discuss only that evidence that favors [her] ultimate conclusion, but must articulate, at some minimum level, [her] analysis of the evidence to allow the appellate court to trace the path of his reasoning.'" (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995))).

The question is whether the ALJ's failure to provide an adequate explanation for her residual functional capacity assessment was harmful. *See McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) ("[W]here the circumstances of the case show a substantial likelihood of prejudice [from the

ALJ's error], remand is appropriate so that the agency 'can decide whether re-consideration is necessary.' By contrast, where harmlessness is clear and not a 'borderline question,' remand for reconsideration is not appropriate."); *cf. Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 657-58 (6th Cir. 2009) ("[I]n some cases it may be difficult, or even impossible, to assess whether an ALJ's failure to rate the B criteria was harmless. In such cases, the record may contain conflicting or inconclusive evidence relating to the B criteria. Or it may contain evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider. As a result, courts generally should exercise caution in conducting harmless error review in this context."). Although the issue is not free from doubt, it does appear that the ALJ's failure to reconcile Johnson's symptoms prior to October 2010 with her conclusion about the benefits of Johnson's mental-health treatment may have prejudiced Johnson on the merits. First, in January 2010, Johnson attempted suicide, or very nearly did so—a fact that the ALJ failed to acknowledge. This is supportive of at least the following testimony from Johnson: "if I get another job, and I lose it, I don't know what's going to happen to me. Something not good is going to happen, I know. I feel it in my heart, you know" and "I have fears about a job, because the last job is what really—I was contemplating suicide, ma'am, because I cannot keep a job." (Tr. 54, 68-69.) Second, the evidence omitted by the ALJ is relevant to the consistency factor that ALJs are required to consider in evaluating a treating-source opinion. *See* 20 C.F.R. §§ 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."), 416.927(c)(4) (same). Here, the ALJ gave Dr. Cho's treating-source opinion "little" weight but did not discuss the above records even to explain why they did not substantiate his opinion. (*See* Tr. 27-28.) Admittedly, the "Listing of Impairments – Section 12" form that Dr. Cho completed indicates very severe limitations (e.g., that Johnson would

decompensate with even a minimal increase in stressors) that may not be supported by the records from Hass, Steinbauer, and Powers that the ALJ failed to discuss. (Tr. 528.) As for Dr. Cho's records, a careful review of his post October 2010 notes also do not reflect findings that lend much support for the severe limitations he set forth in that form. But Dr. Cho's opinion letter provides more tempered limitations that might find support in the records that the ALJ did not acknowledge. (*See e.g.*, Tr. 531 (providing that Johnson's mood instability made it "very difficult" for him to maintain employment and social connections).) Further, in stating that Dr. Cho's records "seemed to be inconsistent" with his treatment notes (Tr. 28), it is unclear whether the ALJ believed that all of Dr. Cho's records—including those prior to October 2010—did not support his opinion, or whether the ALJ's statement was based on Dr. Cho's more recent records. Third, Johnson's application for period of disability makes his treatment records prior to his "dramatically" improved affect crucial. The fact that a dramatic improvement was possible says something about Johnson's prior state of mental-health. Indeed, the record makes clear that Plaintiff's mood went "up and down." A thorough analysis of the records reflecting this fluctuation is warranted. In all, the Court does not believe that remand would be "'an idle and useless formality,'" *Rabbers*, 582 F.3d at 654 (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6 (1969)). *Cf. McLeod*, 640 F.3d at 888 ("where harmlessness is clear and not a 'borderline question,' remand for reconsideration is not appropriate").

This Court's recommendation renders Johnson's other claims of error moot. The Court recommends that the ALJ explain how she resolved the inconsistencies between the records she did not discuss with those that she did. This process may result in the ALJ giving more weight to Dr. Cho's opinion. Further, the ALJ may also find that the records she did not discuss support Johnson's

25

credibility.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ failed to address numerous records reflecting Johnson's mental-health symptoms and that it is not apparent from the ALJ's narrative how she reconciled these records with those that she relied upon in concluding that Johnson was not disabled. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10), which seeks only a remand for further proceedings, be GRANTED, that Defendant's Motion for Summary Judgment (Dkt. 13) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the

response. E.D. Mich. LR 72.1(d)(3), (4).

S/Laurie J. Michelson
Laurie J. Michelson
United States Magistrate Judge

Dated: February 21, 2014

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon the parties and/or counsel of record via the Court's ECF System and/or U. S. Mail on February 21, 2014.

s/Jane Johnson
Case Manager to
Magistrate Judge Laurie J. Michelson